EVAN R. MOSES, CA Bar No. 198099
evan.moses@ogletree.com
NOEL M. HICKS, CA Bar No. 310521
noel.hicks@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:   213-239-9800
Facsimile:    213-239-9045

PAUL B. MASLO *(Pro Hac Vice Forthcoming)*
paul.maslo@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Preston Commons West
8117 Preston Road, Suite 500
Dallas, TX  75225
Telephone:   214-987-3800
Facsimile:    214-987-3927

Attorneys for Defendants
PENSKE LOGISTICS LLC and PENSKE TRUCK LEASING CO., L.P.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LADELL TAYLOR, as an individual, on behalf of himself, and all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PENSKE LOGISTICS, LLC, a Delaware limited liability company authorized to do business in California; PENSKE TRUCK LEASING CO., L.P., a Delaware limited partnership authorized to do business in California; and DOES 1 through 50, inclusive<br><br>Defendants. | Case No. 2:20-cv-11473<br><br>**DEFENDANT PENSKE TRUCK LEASING CO., L.P.'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §§ 1332, 1441, 1446 AND 1453**<br><br>[Filed concurrently with Declarations of Jennifer Diercksmeier and Evan Moses, Certification of Interested Parties, Corporate Disclsoure, and Civil Cover Sheet]<br><br>Complaint Filed: October 16, 2020<br>Trial Date:            None |

TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA AND TO PLAINTIFF AND HIS COUNSEL OF RECORD:

**PLEASE TAKE NOTICE THAT** Defendant Penske Truck Leasing Co., L.P. ("PTL") removes this action from the Superior Court of the State of California for the County of San Bernardino to the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453. As discussed below, this Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act ("CAFA").

## I.     THE STATE COURT ACTION

1.     On October 16, 2020, Plaintiff Ladell Taylor filed a Class Action Complaint in the Superior Court of the State of California, County of San Bernardino, entitled *Ladell Taylor, as an individual, on behalf of himself, and all persons similarly situated, Plaintiff v. Penske Logistics, LLC, a Delaware limited liability company authorized to do business in California; Penske Truck Leasing, Co., L.P., a Delaware limited partnership authorized to do business in California; and Does 1 through 50 inclusive, Defendants*, which was assigned case number CIV DS 2022481 (the "State Court Action").

2.     On November 20, 2020, Plaintiff served Defendants with a copy of the Complaint. (Declaration of Evan Moses ("Moses Decl.") ¶ 3.) A true and correct copy of the Complaint is attached as **Exhibit A** to this Notice of Removal. (*Id.* ¶ 2.)

## II.    THIS NOTICE IS TIMELY

3.     Under 28 U.S.C. § 1446(b)(1), "[t]he notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading[.]" But "if the case stated by the initial pleading is not removable," it may be removed to federal court within 30 days of receiving an "amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28

U.S.C. § 1446(b)(3).

4. "The 30-day time periods under 28 U.S.C. §§ 1446(b)(1) and (b)(3) are not triggered unless the initial pleading or another document provided by Plaintiff affirmatively reveals on its face" that the case is removable under CAFA. *Grigoryan v. Cemex Constr. Materials Pac., LLC*, 2018 WL 5081159, at *2 (C.D. Cal. Oct. 16, 2018) (quotation marks and ellipses omitted). Accordingly, "[a]s long as the complaint or an amended pleading, motion, order or other paper does not reveal that the case is removable, the 30-day time period never starts to run and the defendant may remove at any time." *Id.* (quotation marks omitted).

5. Here, neither the Complaint nor any other document provided by Plaintiff reveals on its face that the case is removable. For example, the Complaint does not state the number of putative class members or an amount in controversy for any of the alleged causes of action. Thus, the 30-day clock has not even started running. *See, e.g.*, *id.* (finding that the 30-day time periods had not been triggered because "the pleading does not reveal on its face that the amount in controversy met CAFA's threshold").

6. In any event, this Notice of Removal was filed within 30 days of the service of the Complaint.

### III. JURISDICTION UNDER CAFA

7. The Court has original jurisdiction over this action under CAFA because the number of potential class members is at least 100, the citizenship of at least one putative class member is diverse from that of at least one defendant, and the amount in controversy exceeds the aggregate value of $5,000,000.[1]

#### A. The size of the putative class is at least 100.

8. 28 U.S.C. § 1332(d)(5)(B) requires that the number of members of all

---

[1] An action may be removed by a single defendant under CAFA without the consent of the other defendants. *See* 28 U.S.C. § 1453(a).

proposed classes in the aggregate be at least 100.

9. In the Complaint, Plaintiff defines the "Non-Exempt Class" as "[a]ll current or former non-exempt employees of Defendants individually and/or collectively in California during the period commencing on the date that is within four years prior to the filing of this Complaint through and including the last date of trial[.]" (Ex. A ¶ 47.)

10. Thus, the Non-Exempt Class includes employees of both PTL and Penske Logistics LLC.

11. PTL's employment records alone show that it has at least 2,794 current and former employees who fall within Plaintiff's proposed Non-Exempt Class. (Declaration of Jennifer Diercksmeier ("Diercksmeier Decl.") ¶ 12.)

12. If the employees of Penske Logistics LLC were also considered, the putative class size would be significantly larger.

**B. The citizenship of at least one putative class member is different from the citizenship of at least one Defendant.**

13. Under 28 U.S.C. § 1332(d)(2)(A), "[t]he district courts shall have original jurisdiction of any civil action in which the matter . . . is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant[.]"

14. <u>Citizenship of PTL</u>. Pursuant to 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." The "'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *The Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1184 (2010). In other words, the principal place of business is the place where the corporation "maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination." *Id.*

15. Here, PTL is a limited partnership. To determine the citizenship of a limited partnership, "courts look through the form of such a business entity to the citizenship of all the members of the partnership." *Carden v. Arkonma Assocs.*, 494 U.S. 185, 187-96 (1990).

16. PTL was formed under the laws of the State of Delaware and its principal place of business was, at the time of the filing of this action, and still is, in the State of Pennsylvania because that is where its headquarters and its executive and senior management personnel, as well as its primary management operations, are located. (Diercksmeier Decl. ¶¶ 2-7.) *See, e.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 557 F.3d 1026 (9th Cir. 2009) (stating that a limited partnership is a citizen of (1) the state under whose laws it is organized; and (2) the state of its principal place of business).

17. PTL has one general partner: PTL GP, LLC. (Diercksmeier Decl. ¶ 8.) In turn, PTL GP, LLC's sole member is LJ VP Holdings, LLC. (*Id.*) LJ VP Holdings, LLC's sole member is Penske Truck Leasing Corporation. (*Id.*) Penske Truck Leasing Corporation is incorporated under the laws of the State of Delaware and its headquarters—and principal place of business—is in Reading, Pennsylvania, where its operations are coordinated. (*Id.*) Therefore, Penske Truck Leasing Corporation is a citizen of Delaware and Pennsylvania.

18. PTL has three limited partners: (1) Penske Truck Leasing Corporation; (2) Penske Automotive Group, Inc.; and (3) MBK USA Commercial Vehicles, Inc. (*Id.* ¶ 9.)

19. Penske Automotive Group, Inc. is a corporation organized under the laws of the State of Delaware. (*Id.* ¶ 10.) Penske Automotive Group, Inc.'s headquarters—and principal place of business—is in Bloomfield Hills, Michigan, where its operations are coordinated. (*Id.*) Therefore, Penske Automotive Group, Inc. is a citizen of Delaware and Michigan.

20. MBK USA Commercial Vehicles, Inc. is a corporation organized under

the laws of the State of Delaware. (*Id.* ¶ 11.) MBK USA Commercial Vehicles, Inc.'s headquarters—and principal place of business—is in Japan, where its operations are coordinated. (*Id.*) Therefore, MBK USA Commercial Vehicles, Inc. is a citizen of Delaware and Japan.

21.  Accordingly, PTL is a citizen of Delaware, Pennsylvania, Michigan, and Japan.

22.  <u>Citizenship of Plaintiff and putative class members</u>. Plaintiff "[w]as and is a resident of the county of San Bernardino, California[.]" (Ex. A ¶ 8(a).) He was allegedly employed by Penske as a driver and delivered "products from the warehouse in Colton, California to various locations throughout Southern California[.]" (*Id.* ¶¶ 8(b), (c).) Thus, during the relevant period, Plaintiff lived and worked in California. Plaintiff does not allege that he was, or is currently, a citizen of Delaware, Pennsylvania, Michigan, or Japan. Indeed, he has not alleged a connection to any of those locations.

23.  In addition, putative class members, who by definition are or were employed in California, like Plaintiff, are presumed to be primarily citizens of the State of California. *See, e.g.*, *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir. 1986) ("place of employment" an important factor weighing in favor of citizenship). Thus, even if Plaintiff was somehow a citizen of Delaware, Pennsylvania, Michigan, or Japan (and there is no evidence that he was or is), there is no possible way that the thousands of putative class members, all of whom worked in California, were also citizens of Delaware, Pennsylvania, Michigan, or Japan.

24.  Accordingly, the minimal diversity of citizenship requirement under 28 U.S.C. § 1332(d)(2)(A) is met.

**C.   The amount in controversy exceeds an aggregate of $5,000,000.**

25.  Under 28 U.S.C. § 1332(d)(2), "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs[.]" The claims of individual class

members are aggregated when determining whether CAFA's $5,000,000 jurisdictional threshold is met. *See* 28 U.S.C. § 1332(d)(6).

26. In alleging the amount in controversy for purposes of removal, PTL does not concede in any way that the allegations in the Complaint are accurate or that Plaintiff is entitled to any of the penalties alleged in the Complaint. Nor does PTL concede that any or all current or former employees are entitled to any recovery in this case or are appropriately included in the putative class.

27. It is the removing party's burden to establish, "by a preponderance of evidence, that the aggregate amount in controversy exceeds the jurisdictional minimum." *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 981 (9th Cir. 2013). To do so, the removing party must "produce underlying facts showing only that it is *more likely than not* that the amount in controversy exceeds $5,000,000[], assuming the truth of the allegations plead in the Complaint." *Muniz v. Pilot Travel Ctrs. LLC*, 2007 WL 1302504, at *5 (E.D. Cal. May 1, 2007) (emphasis in original).

28. In determining the amount in controversy under CAFA, all potential damages based on the claims in the complaint are considered. *See, e.g.*, *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008) ("The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will actually owe").

29. That includes attorney's fees. *See, e.g.*, *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 701 (9th Cir. 2007) (attorney's fees are appropriately counted toward the amount in controversy in CAFA removal actions); *Sanchez v. Wal-Mart Stores, Inc.*, 2007 WL 1345706, at *2 (E.D. Cal. May 8, 2007) (same).

30. Furthermore, "[i]n considering whether the amount in controversy is clear from the face of the complaint, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint." *Altamirano v. Shaw Indus., Inc.*, 2013 WL 2950600, at *4 (N.D. Cal. June 14, 2013) (citing *Korn*, 536 F. Supp. 2d at 1205). *See also Muniz*,

2007 WL 1302504, at *3 ("In measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint.").

31.  While PTL denies the validity of Plaintiff's claims and requests for relief, and does not concede in any way that the allegations in the Complaint are accurate, that Plaintiff's claims are amenable to class-wide treatment, or that Plaintiff or putative class members are entitled to any of the requested relief, the allegations in the Complaint, as well as in the evidence presented in the Diercksmeier declaration,[2] show that the amount in controversy exceeds the jurisdictional minimum of $5,000,000.

**1.  PTL's estimate of the amount in controversy considers only a subset of Plaintiff's claims for only a portion of the putative class.**

32.  In determining the amount in controversy, PTL relies on a conservative estimate based only on damages sought by Plaintiff as a result of the alleged claims for (1) unpaid overtime wages for work performed in excess of 40 hours in one workweek or in excess of 8 hours in one day; (2) failure to provide accurate itemized wage statements; (3) failure to timely pay all wages owed upon separation of employment; and (4) failure to provide required meal and rest periods. Significantly,

---

[2] For purposes of effecting removal, declarations from defendants and their counsel constitute sufficient evidence to establish the amount in controversy. *See, e.g.*, *Muniz*, 2007 WL 1302504, at *2, *5 (relying on evidence submitted by defendant in the form of a declaration from its employee relations manager, which "set forth the underlying facts needed to calculate the amount in controversy," and a declaration from its counsel, which calculated the amount in controversy based on the underlying facts and in light of the laws governing plaintiff's claims, and finding that defendant had shown that "it is more likely than not that the jurisdictional threshold of $5,000,000[] is met"); *Jasso v. Money Mart Express, Inc.*, 2012 WL 699465, at *4 (N.D. Cal. Mar. 1, 2012) (finding there was "adequate foundation" for the declaration submitted by defendant's human resources director regarding "the numbers of employees, payperiods [sic] and average rates of pay during the applicable limitations periods," which was derived from a compilation of "information that is kept in the normal course of business," and relying on the declaration to find that defendant had met its burden to establish that the amount in controversy exceeds CAFA's jurisdictional threshold).

PTL calculates these damages for only those putative class members who are former and current employees of PTL. If the employees of Penske Logistics LLC were also considered, the calculated damages would be significantly higher.

33. Because the amounts in controversy for these claims and putative class members alone satisfy the jurisdictional minimum requirement of $5,000,000, PTL does not include additional analyses of the amounts placed in controversy by Plaintiff's other alleged claims, including for (1) failure to pay minimum wages; (2) violation of California's Unfair Competition Law; and (3) failure to maintain accurate records.

34. If necessary, PTL could and would supplement this Notice of Removal to include estimates of the additional amounts in controversy based on the other causes of action contained in the Complaint, as well as for putative class members who are former and current employees of Penske Logistics LLC.

### (a) The amount placed in controversy by the overtime claim alone easily exceeds $5,000,000.

35. According to Plaintiff, "Penske has a policy, practice, procedure, guideline, and/or culture of not paying Penske Employees overtime wages for hours worked in excess of eight (8) hours per day and/or forty (40) hours per week" and "despite working in excess of eight (8) hours per day and or forty (40) hours per week, he and other Penske Employees were not paid overtime wages in excess of eight (8) hours per day and or forty (40) hours per week." (Ex. A ¶ 37. *See also id.* ¶¶ 82-103 (allegations supporting third cause of action for failure to pay minimum, regular, and/or overtime wages).)

36. Labor Code § 1194(a) provides that "any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."

37. Based on PTL's records, the number of its current and former non-exempt employees in California from October 16, 2016, to October 16, 2020, is 2,794. (Diercksmeier Decl. ¶ 12.) The minimum hourly rate of the putative class members was at least $13.00 per hour.[3] (*Id.* ¶ 13.)

38. PTL's calculation of damages for Plaintiff's overtime claim is **$6,029,224.50** ($19.50 x 1 x 309,191). The computation of the amount in controversy is based on data reflecting (a) that non-exempt California employees worked 309,191 weeks from October 16, 2016, to October 16, 2020; (b) that each putative class member earned a regular rate of at least $13.00 per hour (so that time-and-a-half is equal to $19.50); and (c) that each putative class member incurred only one hour of unpaid overtime for every week of work (significantly, Plaintiff alleges that he worked 60-65 hours per week and was not paid overtime (Ex. A ¶¶ 8(g), 8(j))). (Diercksmeier Decl. ¶¶ 12, 13.)

39. Courts have accepted an estimate of one hour of unpaid overtime for every week of work as a reasonable and conservative figure. *See, e.g.*, *Jasso*, 2012 WL 699465, at *5-6 (finding that calculating at least one violation per week was a "sensible reading of the alleged amount in controversy").[4]

40. Consequently, a very conservative calculation of the amount placed in controversy by the overtime claim alone exceeds $5,000,000.[5]

---

[3] During that same period, the average base pay rate for full-time non-exempt California employees was $26.52 per hour. (Diercksmeier Decl. ¶ 13.) For purposes of these calculations, PTL has conservatively used the lowest hourly rate of $13.00.

[4] In light of Plaintiff's allegation that Defendants' purported failure to pay overtime wages was extensive, *i.e.*, that "Penske has a policy, practice, procedure, guideline, and/or culture of not paying . . . overtime" (Ex. A ¶ 37), "it is reasonable to assume a 100% violation rate in calculating the amount in controversy for this cause of action." *Altamirano*, 2013 WL 2950600, *11.

[5] In reality, the amount placed in controversy by the overtime claim is much higher for four key reasons: (a) PTL's methodology completely excludes all part-time and temporary employees from the calculation, while at least some of those workers undoubtedly worked overtime during the class period; (b) the average base pay rate of the full-time employees was more than two times the minimum pay rate of $13.00 that PTL used; (c) Plaintiff alleges that Defendants paid non-discretionary bonuses, but did not include that amount in the regular rate of pay for calculating overtime

**(b) The amount placed in controversy by the inaccurate wage statement claim alone easily exceeds $5,000,000.**

41. According to Plaintiff, "Penske has a policy, practice, procedure, guideline, and/or culture of furnishing Penske Employees, including Plaintiff, with wage statements that do not comply with California law." (Ex. A ¶ 127.) Specifically, "Plaintiff contends that the wage statements furnished to him and other Penske Employees did not include, for instance, the total hours worked by the employee, all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee, and the actual gross and net wages earned." (*Id. See also id.* ¶¶ 119-33 (allegations supporting fifth cause of action for failure to furnish accurate wage statements).)

42. Labor Code § 226(e)(1) provides the available damages for this cause of action:

> An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

43. The statute of limitations for a claim for wage statement penalties is one year. *See* Cal. Civ. Proc. Code § 340(a).

44. PTL's calculation of Plaintiff's claim for non-compliant wage statements is **$7,421,600**, which is based on an assumed rate of one violation for each putative class member per pay period for which the employee was issued a paycheck during the statute-of-limitations period. (Diercksmeier Decl. ¶¶ 14-16.)

45. An estimate of one wage statement violation for every pay period is

---

(Ex. A ¶¶ 38, 100), and bonuses were similarly not included in the calculations here; and (d) employees of Penske Logistics LLC were not considered.

reasonable, based on the allegations in Plaintiff's Complaint. For example, in *Altamirano*, the court held that it was "reasonable to assume that each putative class member suffered at least one violation during any given pay period, resulting in an inaccurate wage statement," in light of plaintiff's allegations "about the pervasiveness of the policies[.]" 2013 WL 2950600, *11. Here, given Plaintiff's allegation that "Penske has a policy, practice, procedure, guideline, and/or culture of furnishing Penske Employees, including Plaintiff, with wage statements that do not comply with California law" (Ex. A ¶ 127), it would be "reasonable to assume a 100% violation rate in calculating the amount in controversy for this cause of action." *Altamirano*, 2013 WL 2950600, at *11.

46. Consequently, the amount placed in controversy by the wage statement claim alone easily exceeds $5,000,000.

**(c)  Very conservatively, the amount placed in controversy by Plaintiff's claim for waiting time penalties is nearly $1,000,000.**

47. According to Plaintiff, "Penske had and continues to have a policy, practice, procedure, guideline, and/or culture of failing to timely pay all wages due and owing upon separation of employment to all Penske Employees." (Ex. A ¶ 111. *See also id*. ¶¶ 104-18 (allegations supporting fourth cause of action for failure to timely pay all wages when due upon separation of employment).)

48. California Labor Code § 203(a) provides that "[i]f an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

49. Section 203 penalties "accrue not only on the days that the employee might have worked, but also on non[-]workdays," for up to 30 days, and the accrual of these penalties "has nothing to do with the number of days an employee works during the month." *Mamika v. Barca*, 68 Cal. App. 4th 487, 492-93 (1998). As the

"targeted wrong" addressed by section 203 is "the delay in payment" of wages, it "continues so long as payment is not made"; therefore, "[a] proper reading of section 203 mandates a penalty equivalent to the employee's daily wages for each day he or she remained unpaid up to a total of 30 days." *Id*. at 493.

50. Here, Plaintiff's section 203 claim is not premised on only the theory that Defendants failed to timely deliver final paychecks to separated employees. Rather, Plaintiff contends that Defendants owe penalties at least in part as a result of their purported failure to pay all wages owed during employment, including, but not limited to, unpaid minimum and overtime wages, meal period premiums, and rest break premiums. (Ex. A ¶¶ 111-14.) As such, Plaintiff's theory is that such alleged unpaid wages still have not been paid to Plaintiff and putative class members. Accordingly, it is proper to base the amount in controversy for this claim on a 30-day penalty calculated at each former employee's daily wage rate. *See, e.g.*, *Quintana v. Claire's Stores, Inc.*, 2013 WL 1736671, at *6 (N.D. Cal. Apr. 22, 2013) (finding that defendants' waiting time penalties calculation was "supported by [p]laintiffs' allegations" and was "a reasonable estimate of the potential value of the claims" where the complaint alleged that defendants "regularly required" putative class members to work off-the-clock without compensation and defendants estimated that each putative class member "potentially suffered at least one violation that continues to be unpaid") (quotation marks omitted); *Stevenson v. Dollar Tree Stores, Inc.*, 2011 WL 4928753, at *4 (E.D. Cal. Oct. 17, 2011) (finding it reasonable for defendant to assume, in light of the allegations in the complaint, that members of the putative class "routinely" missed meal periods and that "all members of the proposed class . . . would have missed a meal period as described in the complaint at least once and were thus entitled to the waiting time penalty") (quotation marks omitted).

51. PTL's very conservative calculation of Plaintiff's claim for waiting time penalties for failure to timely pay all wages upon termination is **$809,640** (30 x $13.00 x 2 x 1,038). The computation of the amount in controversy is based on data

reflecting that from October 16, 2017, to October 16, 2020,[6] at least 1,038 non-exempt California employees were separated from employment with PTL, Plaintiff's contention that each of these 1,038 putative class members is qualified to receive waiting time penalties,[7] data reflecting that each putative class member earned a regular rate of at least $13.00 per hour, and an extremely conservative estimate that a "day" for the purpose of the waiting time penalty constitutes only two work hours. (Diercksmeier Decl. ¶¶ 13, 17.)

52. Consequently, the amount placed in controversy by the claim for waiting time penalties alone is nearly $1,000,000.

### (d) The amount placed in controversy by Plaintiff's claims for failure to provide meal and rest periods alone is over $4,000,000.

53. "Plaintiff alleges that he and other Penske Employees were not provided with the opportunity to take lawful meal periods because Penske has a policy, practice, procedure, guideline, and/or culture of assigning routes, delivery requirements, and/or workloads that cannot reasonably be completed within their scheduled hours resulting in Penske Employees being directed, compelled, and/or otherwise coerced to work through their meal periods because they were required by Penske to deliver their customer's products in a timely manner." (Ex. A ¶ 28. *See also id.* ¶¶ 54-68 (allegations supporting first cause of action for failure to provide legally compliant meal periods or compensation in lieu thereof).)

54. In addition, "Plaintiff alleges that he and other Penske Employees were not provided with the opportunity to take lawful rest periods because Penske has a

---

[6] The statute of limitations for waiting time penalty claims pursuant to section 203 is three years. *See* Cal. Code Civ. P. 338(a); *Pindeda v. Bank of Am.*, 50 Cal. 4th 1389 (2010).

[7] In light of Plaintiff's allegation that Defendants' purported failure to timely pay all wages due upon termination was extensive (indeed, it was allegedly their "policy" to not pay former employees all wages due upon separation (Ex. A ¶ 111)), "it is reasonable to assume a 100% violation rate in calculating the amount in controversy for this cause of action." *Altamirano*, 2013 WL 2950600, at *11.

policy, practice, procedure, guideline, and/or culture of assigning routes, delivery requirements, and/or workloads that cannot reasonably be completed within their scheduled hours resulting in Penske Employees being directed, compelled, and/or otherwise coerced to work through their rest periods because they were required by Penske to deliver their customer's products in a timely manner." (*Id.* ¶ 32. *See also id.* ¶¶ 69-81 (allegations supporting second cause of action for failure to provide legally compliant rest periods or compensation in lieu thereof).)

55. The statute of limitations for a cause of action for failure to provide legally required meal and rest periods is three years. *See* Cal. Lab. Code §§ 203, 338. This statute of limitations is extended to four years, however, where the cause of action is brought as part of a claim under California Business and Professions Code § 17200. (Ex. A ¶¶ 145-57 (allegations supporting seventh cause of action for violation of section 17200).)

56. Plaintiff does not allege the number of meal periods or rest periods that were not provided to Plaintiff or putative class members. But "Plaintiff alleges that he and other Penske Employees were not provided with the opportunity to take lawful" meal and rest periods because Defendants have a "policy" of assigning "workloads" that "compel[]" Plaintiff and putative class members to work through them. (Ex. A ¶¶ 28, 32, 61, 74.)

57. IWC Wage Order No. 9-2001, which Plaintiff cites (Ex. A ¶ 56), allegedly governs meal periods and provides as follows:

> 11. MEAL PERIODS
>
> (A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee.
>
> (B) An employer may not employ an employee for a work period of more than ten (10) hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked

is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

(C) Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on-duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(D) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

58. IWC Wage Order No. 9-2001, which Plaintiff cites (Ex. A ¶ 71), allegedly also governs rest periods and provides as follows:

12. REST PERIODS

(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

(B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

59. For purposes of calculating the amount in controversy on Plaintiff's meal and rest break claims, the Court may apply a violation rate of at least one meal period violation per week and one rest period violation per week worked in the four-year statute-of-limitations period. *See, e.g.*, *Quintana v. Claire's Stores, Inc.*, 2013 WL 1736671 at *6 (N.D. Cal.) (finding that it is reasonable to assume that each putative class member is entitled to premium pay for one missed meal period and

one missed rest period per week worked); *Jasso*, 2012 WL 699465, at *4-6 (same).

60. As a conservative basis for its calculations, PTL is applying a violation rate of only one meal and one rest break violation *every other week*. Applying this violation rate to only full-time employees,[8] the putative class members would be entitled to recover at least the amount of **$4,019,483 (**$13.00 x 0.5 x 309,191) + ($13.00 x 0.5 x 309,191). The computation of this amount is based on the lowest minimum hourly wage for non-exempt California employees during the alleged class period ($13.00), multiplied by 0.5 hours of pay, multiplied by the total number of weeks in which full-time non-exempt employees performed work between October 16, 2016, and October 16, 2020 (309,191). (Diercksmeier Decl. ¶¶ 12, 13.)

### (e) Summary of PTL's calculations

61. As described above, a reasonable and conservative estimate of the amount in controversy presented by Plaintiff's overtime, wage statement, waiting time penalty, and meal and rest period claims substantially exceeds $5,000,000. Indeed, these four claims alone have placed at least $18,279,947.50 in controversy:

| Claim | Estimated Exposure |
|---|---|
| Overtime | $6,029,224.50 |
| Wage Statement | $7,421,600.00 |
| Waiting Time Penalties | $809,640.00 |
| Meal and Rest Period | $4,019,483.00 |
| **TOTAL** | **$18,279,947.50** |

62. In addition, Plaintiff is seeking to recover attorney's fees. (*See, e.g.*, Ex. A ¶¶ 2, 67, 80, 102, 117, 132.) "Ninth Circuit cases have set twenty-five percent as the 'benchmark' level for reasonable attorneys' fees in class action cases." *Garcia v.*

---

[8] Continuing to calculate the amount in controversy as conservatively as possible, PTL has excluded part-time employees from this calculation. In addition, as discussed above, PTL employees make up only a portion of the putative class.

*Wal-Mart Stores, Inc.*, 2016 WL 6068104, at *6 (C.D. Cal. Oct. 14, 2016). Thus, potential attorney's fees are **$4,569,986.88**.

63. Consequently, the amount placed in controversy by Plaintiff's claims exceeds the $5,000,000 jurisdictional threshold of 28 U.S.C. § 1332(d).

## IV. PTL HAS SATISFIED THE REMAINING REMOVAL REQUIREMENTS

64. <u>Venue is proper</u>. The Superior Court of California, County of San Bernardino, is located within the Central District of California. Therefore, venue for the purposes of removal is proper because the Central District of California is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

65. As further required by 28 U.S.C. § 1446(a), PTL provides this Court with true and correct copies of all process, pleadings, and orders served on Defendants in this action. (Moses Decl. ¶¶ 2, 4-6.) As discussed above, a true and correct copy of the Complaint is attached as **Exhibit A** to this Notice of Removal. (*Id.* ¶ 2.) A true and correct copy of Defendants' Answer is attached as **Exhibit B** to this Notice of Removal. (*Id.* ¶ 4.) True and correct copies of the other documents are attached as **Exhibit C** to this Notice of Removal. (*Id.* ¶ 5.) Defendants have not been served with any pleadings, process, or orders besides those attached. (*Id.* ¶ 6.)

66. In accordance with 28 U.S.C. § 1446(d), PTL will promptly give written notice to Plaintiff of the filing of this Notice of Removal and will file a copy of the Notice with the clerk of the Superior Court of the State of California, County of San Bernardino. Further, in accordance with Federal Rule of Civil Procedure 7.1 and Central District of California Local Rule 7-1.1, Defendants concurrently file their Corporate Disclosure Statement and Certification of Interested Entities or Persons. Finally, in the event that this Court has any question regarding the propriety of this Notice of Removal, PTL requests that the Court issue an Order to Show Cause so that PTL may have an opportunity to more fully brief the basis for this removal.

| | |
|---|---|
| DATED: December 18, 2020 | OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. |
| | |
| | By: /s/ Evan R. Moses |
| |     Evan R. Moses |
| | Attorneys for Defendants PENSKE LOGISTICS LLC and PENSKE TRUCK LEASING CO., L.P. |

45090304.1